847 So.2d 331 (2002)
Jonathan YATES
v.
EL BETHEL PRIMITIVE BAPTIST CHURCH.
1001913.
Supreme Court of Alabama.
October 11, 2002.
*332 Richard D. Horne of Horne & Dailey, L.L.C., Mobile, for appellant.
Vanessa Arnold Shoots and Tracie B. Lee, Mobile, for appellee.
HARWOOD, Justice.
The Reverend Jonathan Yates (hereinafter referred to as "Yates") appeals from the July 19, 2001, judgment of the trial court setting aside a June 17, 2001, election of deacons and trustees of the El Bethel Primitive Baptist Church (hereinafter referred to as "the Church").
On March 30, 2001, the Church, by and through its board of deacons and trustees (hereinafter referred to as "the Board"),[1] petitioned the trial court for a temporary restraining order to prevent Yates from interfering with the financial operation of the Church. On or about April 11, 2001, before the petition had been ruled upon, the Board filed an amended petition, seeking a more clearly focused temporary restraining order, or in the alternative, a preliminary injunction. Both versions of the petition sought an order restraining *333 Yates "from interfering with the financial operation of the Church, interfering with all day to day operations of the Church, including supervising daycare employees and Church employees, and ordering him to direct all Church employees with financial records of the Church to turn over all financial records and documents of the Church to the Deacon and Trustee Boards." In the "complaint" portion of the amended petition, the Board asserted that Yates was "using the church's funds for his personal benefit, providing false financial statements to the Board[ ] at its monthly meetings, and failing to withhold income tax from several employees' paychecks." There were also allegations that Yates had sexually harassed a female employee of the Church. Finally, the assertion was made that Yates had "admitted [to the Board] that he had misappropriated the Church's funds for his personal use and that income tax had not been withheld from several employees' paychecks." The trial court conducted hearings on April 12 and April 17, receiving testimony ore tenus. (The record does not contain a transcript of those proceedings.) On May 18, 2001, the trial court issued an order that stated that "this Court notified both parties that the hearing would be considered [one for] a Permanent Injunction." Thereafter, the court ordered that "The Board of Deacons and/or Trustees are vested by its membership with the authority to transact business on behalf of the Church," including, but not being limited to, the following:
"1. Establish an annual budget for the Church as well as the individual departments and services provided for by the Church.
"2. Appointing a committee consisting of [Yates], Board of Deacons and/or Trustees, and Church members to develop proposed By-Laws for the Church so that there will be a clear line of authority within the Church in the future approving decisions involving major expenditures of the Church. Of course, in all such matters the members of said church, in good standing, should be the final arbitrator in approving or not approving such expenditures.
"3. [Yates] is hereby restrained from obligating the Church and its members in any financial manner without having the authority to do so by vote of the Church and the approval of the Board of Deacons and/or Trustees.
"4. [Yates] is restrained from authorizing loans of Church monies to any person or entity. The Church should not be in competition with financial institutions. And,
"5. A CPA should be employed to audit the financial condition and practices of the Church so that clear violations of financial policies can be corrected. Of course, this, as in any other major decision, should be the joint decision of [Yates] and the Board of Deacons and/or Trustees of said Church."
That order, having addressed all pending issues, and being expressly designated as a permanent injunction, constituted a final order. Yates has not sought in any way to challenge the validity or binding effect of that order. He filed no postjudgment motion seeking to alter, amend, or vacate the order; he filed no appeal with respect to it; and he has not challenged or contested it in this appeal. Accordingly, it stands as the binding "law of the case." Rather than comply with that final order, however, Yates undertook to circumvent it by convening an "election meeting," as referenced in the next sentence and otherwise described and explained in this opinion.
*334 On June 21, 2001, the Board filed a motion for contempt and to set aside an election that had been held at the Church at Yates's insistence on June 17 and that purportedly had resulted in the election of a new slate of deacons and trustees. On June 28, 2001, a hearing was held on the Board's motion, and the trial court heard testimony regarding the events that had transpired at the Church on dates subsequent to its May 18 order. On July 19, 2001, the court issued an order that denied the contempt portion of the motion, but that declared that "the election held on June 17, 2001, is due to be, and is, hereby set aside." In pertinent part, the order stated:
"This matter comes before this Court on a Motion for Contempt and to Set Aside an Election of Deacons of El Bethel Primitive Baptist Church. This matter originally came to this Court's attention following the filing of a Petition for a Restraining Order, which was filed by its Board of Deacons and Trustees. This Court issued an order dated May 18, 2001, which in effect stressed that the Board of Deacons and Trustees and [Yates] should work hand in hand in a harmonious and productive manner for the good of the Church.
"Shortly after the aforementioned order was issued, the present Motion for Contempt and to Set Aside the Results of an Election was filed in this Court. In fact it was on June 21, 2001. In this latest motion, the Plaintiffs allege that Reverend Jonathan Yates has totally ignored the Court's instructions and, in a spiteful and revengeful attitude, sought to dismiss the Deacons who participated and were parties to the original filing of the action in this Court. In addition, the Plaintiffs allege that the Deacons were refused the right to examine the financial records of the Church and that a dictatorial attitude was Reverend Yates's daily demeanor. It is therefore obvious that this cause arises out of disputes between members of the congregation of El Bethel Baptist Church and its Pastor, Reverend Jonathan Yates. The determinative issue is whether the actions by Reverend Yates are contemptuous and whether the election of new Deacons was the result of a valid election. That is, was it held in accordance with the rules the Church has agreed to be bound by?
"As this Court stated in its prior order, it is mindful that Courts are limited in their authority to interfere with the conduct of a religious institution. As was stated in In re Galilee Baptist Church, 279 Ala. 393, [397,] 186 So.2d 102 [,106] (1966):
"`Spiritualities are beyond the reach of temporal courts, and a pastor may be deposed by a majority of the members at a congregational meeting at any time, so far as the civil courts are concerned, subject only to inquiry by the courts as to whether the church, or its appointed tribunal as proceeded according to the law of the church....'
"This Court was convened on June 12, 2001,[[2]] and, the testimony was taken at that time. The testimony of all the witnesses for both parties was taken ore tenus. In addition, exhibits were introduced into evidence. Both sides have presented briefs of legal authorities favoring their contentions. The Court has carefully considered the evidence, statutory law, and appellate decisions, which *335 were discussed in the aforementioned briefs submitted by these attorneys to this Court.
"As stated, it is rather clear that a civil court should not interfere with the questions and issues that would be better left to a vote of the Church members; it is equally clear that a Church must be governed by the rules it has chosen to be governed by. In this particular Church they have chosen to be guided by the Disciplines of The Primitive Baptist Church. These `Disciplines' are printed and a copy of the same was introduced into evidence as an Exhibit. This Court has read these rules from beginning to end.
"Although it is alleged that Reverend Yates acted more like a dictator than a Pastor, this Court did not find sufficient evidence to support [such a finding]. However, it is clear that the Plaintiffs may have felt intimidated by the action of Reverend Yates and the fact that the `Disciplines' were not followed. Although as stated earlier herein, this Court is reluctant to become involved in questions and issues that would be better left to a vote to the Church members, the Church through its Pastor must follow its own rules. These rules should have been followed to the letter. These rules were not strictly followed.
"In view of the foregoing, it is ORDERED, ADJUDGED, and DECREED by this Court that the Motion to Hold Reverend Jonathan Yates in contempt is hereby DENIED. It is further ORDERED, ADJUDGED, and DECREED that the election held on June 17, 2001, is due to be, and is hereby set aside."
On July 25, 2001, Yates filed a motion for stay of the July 19, 2001, order pending appeal; the trial court denied that motion on August 1, 2001. On appeal, Yates argues that the June 17, 2001, election was consistent with the Church's rules, with Alabama law, and with the considerations of notice and due process, and, thus, that it was a valid, legal election. The core of Yates's argument to this Court is "that the opinion of the trial court is not fairly supported by credible evidence under any reasonable interpretation and that it is palpably wrong." The Board argues that the manner in which the election was conducted violated the due-process rights of the members of the Board and was contrary to various procedural steps mandated by a set of rules entitled "the Discipline of the Primitive Baptist Church" (hereinafter referred to as "the Discipline"). Specifically, the Board argues that Yates: (1) failed to inform the Board of the matters he planned to raise before the Church on June 17 as required by the Discipline; (2) failed to follow the procedures of the Discipline in conducting the election meeting, including denying any of the members present at the election meeting the right to ask questions or otherwise to be heard; (3) failed to determine whether persons voting in the June 17 election were "members of good standing" of the Church, as required by the Discipline; (4) had several microphones that were usually in place on the floor of the sanctuary removed, so that none was available for use by the congregation and the only microphone was the one located in the pulpit; (5) intimidated the members into voting the way Yates suggested they vote; and (6) failed to use the Primitive Baptist Church Association's own moderator to oversee the meeting, although he had offered his services to Yates, choosing instead to call in a moderator from another Baptist discipline.
This Court has on a number of occasions exercised its jurisdiction to determine whether an election meeting of a church, or a similar meeting, was conducted so improperly as to render its results void. *336 See Barton v. Fitzpatrick, 187 Ala. 273, 65 So. 390 (1914); Davis v. Ross, 255 Ala. 668, 53 So.2d 544 (1951); In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966); Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746 (Ala.1977); Foster v. St. John's Baptist Church, Inc., 406 So.2d 389 (Ala.1981); and McKinney v. Twenty-Fifth Avenue Baptist Church, 514 So.2d 837 (Ala.1987). In Williams v. Jones, 258 Ala. 59, 62, 61 So.2d 101, 104 (1952), we cited several of our cases in which, "the civil courts of this state have taken jurisdiction of disputes between factions of Baptist churches or of churches similarly governed on the ground that property or civil rights were involved." This case began as one involving the finances, financial assets, and business of the Church, not any of its purely ecclesiastical or spiritual features, and those financial and business aspects of the Church have remained center stage throughout.
In Abyssinia Missionary Baptist Church, supra, individuals who claimed they had been wrongfully expelled from membership in the church filed an action against the pastor and the church secretary alleging that the pastor and the secretary had misappropriated church moneys and that they had refused to hold a meeting of the church at the request of a majority of the members of the church, for the purpose of determining who had the right to control church property. The plaintiffs asked the court to order an election by the congregation to determine if the pastor should resign and the secretary account for the church moneys. The trial court granted the defendants' motion to dismiss, on the basis that the plaintiffs had no standing to bring the action and, even assuming they did have standing, the court had no jurisdiction to decide the matter. On the plaintiffs' appeal from the judgment of dismissal, this Court declared as follows:
"As is the case with all churches, the courts will not assume jurisdiction, in fact [have] none, to resolve disputes regarding their spiritual or ecclesiastical affairs. However, there is jurisdiction to resolve questions of civil or property rights. Williams v. Jones, 258 Ala. 59, 61 So.2d 101 (1952).
"This court takes cognizance of the well established case law of this State pertaining to the Baptist Church and the limited nature of this State's courts' jurisdiction over the business transacted within the Baptist Church.
"In a Baptist Church, the congregation rules. The majority of the members of the church control the business of the church, and the minority must submit to the will of the majority. Williams, supra. Defendants contend the law of Alabama is that the business of the courts is not to determine who ought to be members of a church, nor whether dismissal is just or unjust, but to accept expulsion as conclusive proof of nonmembership. Mount Olive Primitive Baptist Church v. Patrick, 252 Ala. 672, 42 So.2d 617 (1949).
"A more accurate reflection of present Alabama law on this subject is found in In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966); also involving a dispute between two opposing factions, and the alleged expulsion of the pastor at a congregational meeting. This court demonstrated it is proper for the courts to inquire whether a congregational meeting, at which church business is to be transacted, was preceded by adequate notice to the full membership, and whether, once called, the meeting was conducted in an orderly manner and the expulsion was the act of the authority within the church having the power to order it.
*337 "Once the court is presented with sufficient evidence regarding the regularity of the meeting, it will then generally refuse to inquire further as to the fruits of the meeting. As was stated in Galilee:
"`... Spiritualities are beyond the reach of temporal courts, and a pastor may be deposed by a majority of the members at a congregational meeting at any time, so far as the civil courts are concerned, subject only to inquiry by the courts as to whether the church, or its appointed tribunal has proceeded according to the law of the church....'
"We recognize here there are civil, as opposed to ecclesiastical, rights which have cognizance in the courts. A determination of whether the fundamentals of due process have been observed can be made in the judicial arena.
"The trial court erred when it dismissed this action, on a [Ala. R. Civ. P.] 12(b) motion, on the grounds that the court lacked jurisdiction and plaintiffs lacked standing. Plaintiffs are entitled to present evidence as to the proper established procedures of the Baptist Church on the issue of the validity of expulsion from membership."
340 So.2d at 748.
El Bethel Primitive Baptist Church, Inc., is an Alabama incorporated religious society. It is undisputed that it operates under a set of rules entitled the "Discipline of the Primitive Baptist Church."[3] On or about January 20, 2001, the Board received a complaint from a female employee of the Church, alleging that Yates was sexually harassing her, that he was using the Church's funds for his personal benefit, that he was providing false financial statements to the Board, and that he was failing to properly withhold income tax from the paychecks of several Church employees.
On January 23, 2001, the Board wrote Yates a letter explaining the Board had met, with 13 members in attendance, and had unanimously voted to remove him from his supervisory and administrative duties pending the Board's investigation of the charges, explaining that "a committee of the Board [would] manage all church business affairs" in the interim. On January 25, 2001, Yates wrote a letter addressed to the "Board of Deacons," stating that he would continue managing the Church on a daily basis and that the "Board of Deacons" had no authority to manage the business affairs of the Church inasmuch as "[m]anagement of the business affairs is vested in the Pastor and the Board of Trustees." In their amended verified petition, filed in the trial court on April 11, 2001, the Board averred that on February 15, 2001, Yates had met with its members and admitted that he had misappropriated funds for his own use and that income taxes had not been withheld from some employees' paychecks, but assured the Board that he wished to work with the Board to resolve these issues. Sometime in February, the employee informed the Board that she had formally reported the Church's failure to withhold income taxes to the Internal Revenue Service, that she had filed criminal charges against Yates, and that other Church employees had filed criminal charges against Yates, also alleging sexual assault. She also informed the Board that she and the other employees had retained an attorney to pursue an action against Yates and possibly against the Church.
*338 On February 22, 2001, the Board wrote another letter to Yates, stating that the Board had met further and that "[t]he issues addressed by the Board reflect the business and financial management of the Church exclusively" and outlining the financial and management issues that needed to be resolved between the Board and Yates. The Board asserts that although Yates had expressed his desire to resolve those issues with the Board, he failed to comply with its requests.
At several stages of the proceedings, the Board attempted to use the appeal process provided by the Discipline. The Discipline, in pertinent part, states:
"Whenever any problem arises between the Church and Pastor or Pastor and Church which cannot be settled between them, the procedure will be as follows:
"1. The Executive Board of the association of which the church is a member shall be called in to handle the problem.
"2. If satisfaction is not obtained from the Executive Board, the next step of appeal is to the association of which the church is a member.
"3. If satisfaction is not obtained from the association, the next procedure of appeal is to the State Convention.
"4. If satisfaction is not obtained from the State Convention, the next procedure of appeal is to the National Primitive Baptist Convention.
"NOTE: THE DECISION OF THE NATIONAL PRIMITIVE BAPTIST CONVENTION SHALL BE FINAL.
"NO CHURCH OR PASTOR IS PERMITTED TO CARRY A CASE TO THE CIVIL COURT OF THE LAND."
Milton Tucker, chairman of the Board, testified at the June 28 hearing that he had contacted the Primitive Baptist Church Association and asked it to step in "[a]t least five times. At each step of the proceedings, [he] asked the association to step in." He was not allowed to say what response he had gotten, because Yates's counsel voiced a hearsay objection. Tucker also testified that he had contacted the president of the National Primitive Baptist Convention to ask for assistance, but he was not allowed to testify as to its response, again because of an interposed hearsay objection. Reverend James Kemp, the Association's moderator for the area,[4] testified at the June 28 hearing that although some members from the Church had requested the Association's executive board to meet with them, no action had been taken by the executive board or the Association because neither had received the proper notice, i.e., an invitation from Yates, and, therefore, they were unable to help. In explaining why he had not taken action to assist the Church, Kemp stated, "I'm telling you now I have to be invited in by the pastor ... as long as the Church has a pastor, we cannot bulldozer [sic] our way in there." He further testified that he had called Yates "about two weeks, a little better than two weeks" before the hearing for the purpose of "checking with him to *339 see whether or not that he needed the [executive] board or not to help solve the problem before it escalated to here," but Yates had told him that "he didn't see where he needed the board at this time; if he needed me, he would call me." Kemp also testified that he had met with some of the trustees and deacons while they were attending an annual meeting in Mobile "Wednesday evening last week or week before." Milton Tucker, when asked what assistance, if any, the Association had ever provided after being notified of the problems at the Church, answered, "[t]hey offered none." The evidence in the record was sufficient to allow the trial judge to conclude, without being plainly and palpably wrong, that Yates declined to engage in the appeal process that the Board sought to pursue.
As noted earlier, on March 30, 2001, the Board filed a petition for a temporary restraining order. The Board alleged in that petition that Yates had sexually harassed an employee of the Church, that he had improperly used the Church's funds for his own use, that he had provided false financial statements to the Board at its monthly meetings, and that he had failed to withhold income taxes from several employees' paychecks. In its amended petition filed on April 11, the Board stated that it sought the restraining order to prevent Yates from "interfering with the financial operation of the Church" in various ways, which, if continued, would cause irreparable harm to the Church. As also already noted, after two days of hearings, the trial court issued an order on May 18, 2001, restraining Yates in certain respects and directing him to work with the Board to resolve the financial and administrative challenges facing the Church. Pursuant to that order, the Board met twice to resolve the issues facing the Church, but Yates attended only the first of those two meetings, and in that meeting, stated that he would hold a meeting with the Church's membership the next day and that the Church would vote on the matters discussed in the Board meeting. During the hearing before the trial court, when questioned about whether Yates stated a purpose for the congregational meeting, Linnie Edmund, a Church member who asserted that he was vice chairman of the Board, testified that Yates replied, "You'll find out when you get there." The Discipline provides:
"1. Deacons Meeting
"The Deacons' Board meeting should be held before the monthly conference. The Pastor should always be present to give advice; by doing so, he then succeeds in keeping in line and harmony with every department of the church. All matters should be brought before the Deacons' Meeting; all committees should report to the Deacon Board and then retire."
On May 27, 2001, during Sunday service, Yates announced to the congregation that the Church would have a meeting on Sunday, June 3, 2001, after the regular service.
On that date Church members gathered at the Church for the meeting called by Yates. In the course of his presentation, which was videotaped,[5] Yates stated:
"I cannot feel peace knowing that a church or anybody can trust me in the pulpit with the spiritual and cannot trust me on the floor with the Lord's money.
". . . .
"Keeping in mind that the pastor needs the support of the deacons and trustees, and looking toward moving forward as a united church, and putting this lawsuit behind usI find that I cannot work in *340 the future with the men who filed this lawsuit against me.
". . . .
"This Church is 107 years old and up until a few months ago, has never been in a courtroom. This pastor has preached for 31 yearsthere are people who sitting among us who are beneficiaries of gifts, loans, children who went through daycare free, children who are still in daycare for little or nothingthis pastor has nothing to hide. This Church cannot move forward with divided peopleI need memberswho have the best interests of the Church at heart to work with me, not against me and to work for the Church ....
". . . .
"I believe this lawsuit should never have been filedit's against the Bible, it's against the Disciplines, it's against everything we believe
". . . .
"For these reasons and so many more, I am calling for a vote by the members of this Church, to elect new deacons and trustees who will serve a one-year term."
Yates also informed the membership that the trial court would respect any elections held by the Church, and that the Church would elect new officers, other than the pastor, for one-year terms and would create clear lines of authority in the future. Yates then recommended to those present at the meeting a list of new Board members. A motion was made and seconded that the individuals Yates recommended be placed on the Board.
However, some of those present requested a chance to speak before the vote was taken, and a few persons were given the opportunity to speak by Yates. After each speaker had addressed those present, Yates expressed his position on the subject raised by the speaker. After all of those allowed to speak had finished, Yates again addressed those present and reiterated his concerns and informed those present that he could not work with the current Board. At that point, the meeting had lasted much longer than the time allotted to it, and Yates proposed that the discussion be tabled. One of those present moved for the motion to be tabled with the implied understanding that there would be additional meetings to discuss the issues facing the Church. The motion was seconded, a vote was taken, and the matter was tabled.
Shirley Sessions, a Church member, testified at the June 28 hearing that on Sunday June 10, 2001, Yates informed the Church members present that "there would be a meeting on Sunday the 17th to discuss the business that was left over from Sunday of the 3rd." At the June 17, 2001, meeting, Yates addressed the congregation and stated that although he possessed the authority to conduct the proposed election, he had contacted and obtained the services of Reverend Wesley James, Pastor of the Franklin Street Missionary Baptist Church in Mobile, to ensure that the election would be conducted impartially. When Kemp, the Association's moderator, was asked at the June 28, 2001, hearing whether it was proper for Yates to moderate a meeting of this kind, he testified: "[T]hat depend[s] upon whether or notif he is in a debate with any member of that church, he is not supposed to hold that chair to moderate that meeting." Upon being questioned as to whether Yates's calling in James to moderate, as opposed to Kemp, was proper, Kemp testified, "That's not the procedure." When asked if there was anything wrong with Yates's actions in doing so, Kemp testified, "If it's not right, it's [sic] something wrong with it." During his June 17 videotaped address to the membership of the Church, Yates stated:

*341 "There will not be any, again, any disruption or disorder, especially from the same onesthe same ones who, who, who did this last time.
"I'm asking thatAre the sheriff's deputies here yet?
"I'm willing to acceptI'm willing to accept whatever this Church says whatever this Church saysI'm willing to acceptwhatever El Bethel membership says. Those who [are] here this moment, I'm willing to accept thatand everybody else should be willing to acceptwhat this membership has to sayAmen.
"We gonna abide by this membership. Nobody is bigger or above this membership.
"The officers, again will be hereto ensure that every member will have an opportunity to vote.
"We are here today for just one thingand that is to elect officersto elect officers or if this Church say so keep the same slate of officers we already have. All of the commenting and questioning and allwe did that the last meeting, this is an election and that's the only thing we will recognize and everything elseand everything else will be out of ordereverything else will be out of order.
"We are here for one purpose, and again Pastor James will be presiding Pastor James will be presidingover this election and that's all it will be."
In the course of his address, Yates had the ushers of the Church provide each person present an attendance sheet to be signed. He later instructed the ushers to collect the attendance sheets. Thereafter, Yates had the ushers provide each person present with a ballot for the election. Although several people in the pews attempted to question Yates, he refused to acknowledge the remarks of those present[6] and continued to restate the purpose of the meeting. Yates did not provide any members at this meeting the opportunity to express their concerns to the rest of those present.
Yates explained to those assembled that there were two boxes that those present would deposit their ballots intoone box bearing the word "yes" in several places and one box bearing the word "no" in several places. Upon the determined insistence of one of those present, Yates had one of the boxes removed and removed the identifying words from the other. After making a few brief remarks, Yates left the podium and James replaced him.
The Discipline states that "No member shall be in good standing who fails to pay his assessment within ninety days to the Church. At the expiration of ninety days, his or her membership shall cease. No member shall be eligible to vote unless he is paid up to date." The Discipline also provides that the clerk or secretary of the church "shall ... be the custodian of the records and papers of the church; viz., Insurance records, and all other papers of value to be entrusted in him or her." According to the testimony in the record, including that of Deborah Jackson, the Church secretary and clerk, there was neither a membership list nor any financial records at any of the meetings and Jackson was unable to determine whether those present were paid up to date.
In preparing for the vote, James testified that he asked those present if the Church had been certified,[7] and further stated:

*342 "Nobody objected to me calling was the house certified, and at that point when I asked was the house certified, if there was any objections, they should have been raised at that point. If they didn't feel the house was certified properly, it should have been raised at the point when I asked the question about certification."
Neither James nor Yates informed the congregation that it could object to the certification. On this point, James added:
"The reason I thought that they [the people present at the election] would have been able to understand was because supposedly they had read their Discipline."
Through further cross-examination of James, it was revealed that the Discipline makes no provision for a certification, and it does not discuss how properly to object to one. When this conflict was brought to James's attention, he testified:
"[T]hey are very intelligent folk, and if they did not understand me, they would have asked me what is certification, and I ...."
At this point James was asked, "but they weren't allowed to ask questions; right?" James replied, "yeah." The videotape of this meeting, which is a part of the record, shows that before the vote was taken, only Yates and James were allowed to address those present; none of the deacons or trustees who were subsequently replaced were permitted to address those present. James deflected several attempted questions by stating that the only purpose of the meeting was to conduct the election, finally announcing, "We're going to proceed with the election."
In the course of placing her ballot in the box, a voter asked James whether the people voting were in good standing as required by the Discipline. James did not answer her question and, instead, he asserted that the "house" had been certified. After the votes had been collected by the ushers, six individuals, three chosen by Yates and three chosen by the Board members whose positions were being voted upon, were chosen to count the votes and to validate the total by agreement. Those individuals counted the votes and agreed that the total count of the votes was proper. They then delivered the ballots along with the totals to James.
Of the 240 votes taken that morning, 130 were in favor of Yates's recommendations, and 100 voted to keep the current members. Five votes were disqualified because the voters had not signed their names to the ballots, as required by Yates, and five were not counted because the individuals had not recorded their votes properly. Upon questioning by the trial judge, Linnie Edmund testified that the members who had been voted off the Board at the June 17 meeting were persons who had previously sought injunctive relief to restrain Yates's role in the financial matters of the Church in the trial court during May 2001.
The Discipline states, in pertinent part:
"Article 1. There shall be a regular conference, once in each month, and others if the Church shall order them, which shall be composed of the members of the Church, each member enjoying equal privileges.
"Article 2. The Conference thus formed, the Moderator shall have power to govern according to the rules written herein.
"Article 3. The Pastor, or supply [sic], shall be the Moderator, unless absent; or if circumstances require, the Church shall appoint a Moderator.

*343 "Article 4. All persons, speaking in a debate or making a motion, or introducing an instrument in writing, shall rise from their seats and address the Moderator, and shall not be interrupted while speaking, unless they depart from the subject or use unbecoming language; in either case, the Moderator shall call them to order.
"Article 5. All motions made and seconded shall come under the consideration of the conference, and after allowing sufficient time for debate[,] shall be put to a vote and the decision will be announced by the Moderator, unless it be withdrawn by the mover.
"Article 6. No person shall speak more than three times on the same subject, without the consent of the Moderator.
". . . .
"Article 10. The Moderator shall not speak in a debate, unless the chair be filled and he becomes subject to these rules. He shall vote only in case of a tie."
In regard to the election of deacons,[8] the Discipline states:
"The church will choose the man possessing the qualifications (not one that will possess the qualifications, but one already full of the Holy Ghost and wisdom) [to be a deacon]. The church shall proceed as in the case of ordaining a minister to obtain a Presbytery[[9]] and orgaize in the same way. The Church, by her spokesman, will then place the candidate before the Presbytery and the one appointed to examine will proceed to examine the Church as follows:
"Question: Do you wish this brother ordained to the office of a deacon?
"Answer: We do.
"Question: Have you found him possessing the qualifications laid down in God's Word?
"Answer: We have.
"Question: If he is ordained will you help in the faithful discharge of his duty to the Pastor, Church and the Poor?
"Answer: We will.
"(The deacon will be elected annually.
"He will then examine the candidate as follows:
"Question: Are you willing to be set apart to the office of a Deacon?
"Answer: If you think me qualified, I am.
"Question: What do you consider the duties of a Deacon?
"Answer: (Name the duties.)
"Question: Will you, if ordained, faithfully discharge your duties as a Deacon?
"Answer: I will, God being my helper.
"The Presbytery will then examine him on the faith in the same way that *344 it does the Minister. Then, all being satisfied, it shall set apart him in the same way; and after prayer give him the right hand of fellowship and then the charge. Then the following entry should be placed in the minutes:
"Having chosen brother ____ as deacon, Elders _____, _____, and _____ being present, after examination proceeded to set him apart to the office of deacon by the imposition of hands and prayer. Done in Conference this ___ day of _____ A.D. 19___. Elder _____, Moderator; _____ Church Clerk.
"NOTE: From this day forward, no brother shall be elected and ordained to the office of a deacon of the Primitive Baptist Church, whose wife is a member of another denomination. (The same rule applies to ordaining an Elder.) No brother shall be ordained to the office of a deacon that cannot read and write."
The Discipline also provides for the election and removal of the "Trustee Board" as follows:
"d. The Trustee Board:
"1. Is elected by the Church or appointed by the pastor to meet the civil laws.
"2. It may be dismissed by the Church."
Although the Discipline requires that "[a]ll officers except the pastor shall be elected annually and may be dismissed from official duties when the Church deems it necessary," elections at the Church were much less frequently held.[10]
The Chief Justice states in his dissent that "the parties seeking judicial intervention... disregarded the requirement [in the Discipline] to appeal local church governance decisions to and within the congregational hierarchy." 847 So.2d at 362. Yates's argument in that regard on appeal, however, was not that the Board was acting prematurely or contrary to the Discipline in instituting this legal proceeding. Rather his reference to the appeal procedure is made simply for the purpose of chiding the Board for its alleged hypocritical inconsistency in contending that the June 17 election should be set aside for violating the Discipline, stating "[t]he Deacons/Trustees are not exactly slaves to the Primitive Church Discipline." Immediately following that statement, Yates sets out in his brief to this Court the text of the appeal procedure contained in the Discipline, but without any ensuing argument that some failure by the Board to follow that procedure strictly should preclude court action. In his reply brief, Yates takes note of the Board's proposition stated in its brief as "Issue A" that "Alabama caselaw gives Courts jurisdiction to consider this matter." The Board cited Abyssinia Missionary Baptist Church v. Nixon, in support of that principle, asserting that in that case this Court "held that Alabama courts had the authority to set aside elections," and quoting from the case the statements that "[a] determination of whether the fundamentals of due process have been observed can be made in the judicial arena," 340 So.2d at 748, and "it is proper for the courts to inquire whether a congregational meeting ... was preceded by adequate notice to the full membership, *345 and whether ... the meeting was conducted in an orderly manner and the expulsion was the act of the authority within the church having power to order it." 340 So.2d at 748. After taking notice of the Board's presentation of that issue, Yates goes on to state in his reply brief that he "does not dispute that this Court has jurisdiction to consider this appeal." Consistent with that position, Yates has nowhere argued to this Court that some failure by the Board to exhaust the appeal procedure impaired its standing to present the merits of this case to the trial court or to this Court.
The July 19, 2001, order from which Yates appeals was based upon ore tenus evidence. Our standard of review of such judgments is settled:
"[U]nder the ore tenus standard of review, the trial court's findings of fact based on oral testimony, and a judgment based on those findings, are given a presumption of correctness. A judgment based on such findings will not be reversed unless it is shown to be plainly and palpably wrong. The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony."
Ex parte Pielach, 681 So.2d 154, 154-55 (Ala.1996) (citations omitted). Moreover, where the trial court does not make specific factual findings, this Court will assume that the trial court made the findings that would support its judgment. Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992).
Based on the record before us, including the two videotapes constituting several hours of viewing, we conclude that the trial court could have found, without being plainly and palpably wrong, (1) that it could properly exercise jurisdiction, given the financial and property rights of the Church that were involved; (2) that although it had issued an order on May 18, 2001, addressing certain of the financial and business issues (from which no appeal has been taken) and encouraging cooperative engagement between Yates and the Board, Yates had undertaken to circumvent that order by forcing the election of a new Board; (3) that the election meeting that took place on June 17, 2001, violated the Discipline in several material respects and also violated basic standards of due process; and (4) that the Board attempted in good faith to use the appeal procedure but was thwarted in that effort through no fault of its own and in large part due to Yates's refusal to participate in the process. We reiterate that the trial judge heard two days of ore tenus testimony in April 2001, but no transcripts of those hearings were provided as a part of the record for this appeal. It is a well-established principle of appellate procedure that "when all the evidence before the trial court is not before this Court, it is presumed that the missing evidence is sufficient to support the judgment and the judgment [will] not be disturbed." Seidler v. Phillips, 496 So.2d 714, 716 (Ala.1986) (concluding citations omitted).
The passages from Desribes v. Wilmer, 69 Ala. 25 (1881), quoted by Chief Justice Moore and Justice See in their dissents, explaining why resolution of "religious quarrels or persecutions" and "questions of polemic theology" are not for the courts to undertake, are as vital and valid today *346 as when this Court first expressed them 120 years ago. In that case the Reverend Father Joseph Desribes, a Catholic priest, sought in the Probate Court of Mobile County to be appointed testamentary guardian for two orphaned sisters, ages 9 and 10. Father Desribes's expressed purpose in seeking the guardianship was so that the children might be immediately placed on a French vessel for passage to France, where they would live with, and be raised in the faith of, the sister of their recently deceased father, Charles Corege. After the appointment was initially granted on Father Desribes's ex parte application, the Reverend R.H. Wilmer appeared to object. He was the rector of the Protestant Orphan Asylum in Mobile, also referred to in the opinion as the "church home," and the children were already in his custody as residents of the home, having been placed there with their father's consent and approval. The probate court set aside its order and entered a new one, refusing to appoint Father Desribes as guardian. Following his appeal to the Circuit Court of Mobile County, which affirmed the final order of the Probate Court, Father Desribes appealed to this Court. His counsel argued on appeal that Mr. Corege had "on his death-bed acknowledged spiritual allegiance" to the church in which he had been baptized, thereby implicating in the case "the still more precious rights of conscience." 69 Ala. at 27. Counsel for Father Desribes further asserted that "the main issue raised, is as to the religious training of the children." 69 Ala. at 27.
It was against this backdrop that this Court made the observations quoted in the dissents, after having first noted that history showed "that differences in religious faith and creed" had given rise to some of the bitterest quarrels the world had seen. 69 Ala. at 26. The Court noted that "liberty of conscience" was guaranteed to every man by the Alabama Constitution, but emphasized that its duty was to "deal with the case upon its dry legal bearings, as if it presented no question of religious differences; in other words, as if the rival claimants were of one religious faith." 69 Ala. at 26.
The Court then proceeded to decide the case solely on the law pertaining to testamentary guardianships and guardianships in general, with "religious predilection ... kept out of view." The Court affirmed the judgment of the circuit court.
Thus that case invoked, but this Court refused to entertain, "differences in religious faith and creed" between "rival claimants" of different religious faiths, contesting for the "religious training of the children." At the heart of the case, as counsel for Father Desribes sought to present it, were "questions of polemic theology," which this Court refused to consider.
In contrast, neither side to the present case seeks to raise such questions. They argue no issues of differences in religious faith or creed, and argue no spiritual conflicts, or ecclesiastical doctrine. Rather, the underlying dispute revolves around the property of the Churchcontrol over its financial assets and affairsand not God.
We conclude that, under the circumstances of this case, the trial court did not err in examining the circumstances surrounding the purported election. See Galilee, supra. We further conclude that because live testimony was presented to the trial court concerning disputed issues of fact, the ore tenus rule applies and, therefore, we must accord the trial court's findings a presumption of correctness. See Pielach, supra. Upon examining the Discipline and all the materials contained in the record, we conclude that the record indeed supports a finding that the appeal *347 process provided for in the Discipline was frustrated, and there is evidence to support the trial court's finding that the procedures for elections, as enumerated in the Discipline, were not followed. Thus, we hold today that the trial court did not err in setting aside the election. Accordingly, we affirm the order of the trial court setting aside the June 17, 2001, election. Our affirmance of that order does not, of course, preclude any further actions by any of the parties done in conformity with the Discipline.
AFFIRMED.
HOUSTON, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
LYONS, J., concurs specially.
MOORE, C.J., and SEE, J., dissent.
LYONS, Justice (concurring specially).
I concur fully with the main opinion.
While I share Chief Justice Moore's concerns over the problems inherent in allowing secular courts to adjudicate ecclesiastical controversies unless, at a minimum, a property right or a civil right is implicated, I am having a logical disconnect when it comes to categorizing this dispute as one that does not involve a property or civil right. The Chief Justice concludes his dissenting opinion by stating that "those who misunderstand that jurisdictional separation [of church and state] ... wrongfully intrude the powers of the state into matters of faith and worship. To do so is error." 847 So.2d at 369. I cannot classify the activities before us as arising out of "matters of faith and worship."
Chief Justice Moore's dissenting opinion describes the controversy as based on allegations as follows:
"[Reverend Yates ] had sexually harassed [a female employee ] and ... had mismanaged church funds. Subsequently, the Board purported to remove Yates from the day-to-day management of the Church so it could investigate the allegations; however, Yates refused to cooperate.
"According to the Board, Yates admitted to some financial mismanagement but said that he wanted to work with the Church and the Board to rectify the situation. Still, according to the Board, Yates failed to cooperate with the Board on any occasion. The Board's other attempts to resolve the problems internally, even with the informal help of the Primitive Baptist Church Association, proved unfruitful."
847 So.2d at 348 (emphasis added).
This action arose after Reverend Yates used questionable procedures to rid himself of Board members who opposed him after he was accused of conduct that, if true, is illegal, not simply immoral. We are not here confronted with doctrinal clashes over who is the better believer. I therefore cannot vote to have this Court stay its hand on grounds of deference to the authority of a church over matters arising from allegations of sexual harassment and mismanagement of church funds. I cannot subscribe to the applicability of the concepts described so eloquently in the Chief Justice's dissent to this case.
MOORE, Chief Justice (dissenting).
I respectfully dissent from the majority opinion. By interfering with and interrupting the procedure of the National Primitive Baptist Convention, a circuit court of this State has adjudicated a purely ecclesiastical dispute that should have been settled by the church's denominational process. As our courts have long recognized, a valid line separates the jurisdictional spheres of state and church, and this line may not be crossed without violating the integrity of the governments of each of *348 those spheres. Watson v. Jones, 80 U.S. (13 Wall.) 679, 732, 20 L.Ed. 666 (1871). In recent times, we have commonly referred to this line as the separation of church and state. While the separation of church and state is a familiar phrase in today's society, it is one whose meaning has been obscured through overuse and repeated misapplication.

Facts and Procedure of the Case
This case originated when a female employee of El Bethel Primitive Baptist Church (hereinafter sometimes referred to as "the Church") filed an informal complaint with El Bethel's Church Board of Deacons and Trustees ("the Board") against Jonathan Yates, El Bethel's pastor. She alleged that he had sexually harassed her and that he had mismanaged church funds. Subsequently, the Board purported to remove Yates from the day-to-day management of the Church so it could investigate the allegations; however, Yates refused to cooperate.
According to the Board, Yates admitted to some financial mismanagement but said that he wanted to work with the Church and the Board to rectify the situation. Still, according to the Board, Yates failed to cooperate with the Board on any occasion. The Board's other attempts to resolve the problems internally, even with the informal help of the Primitive Baptist Church Association, proved unfruitful.
On March 30, 2001, some Board members sought a temporary restraining order to remove Yates from control of day-to-day operations of El Bethel.[11] Expressing a reluctance to become involved in issues related to church governance, the Mobile Circuit Court initially refused to issue the requested orders, ruling instead that the duly elected Board should deal with the matter. Apparently in response to the Board's attempts to remove him from his office, Yates, on June 3, 2001, proposed that the congregation elect new Board members.
The proposed election was tabled until June 17, 2001, when Yates, during a congregational meeting, made an impromptu, impassioned appealalso in apparent violation of the Discipline of the Primitive Baptist Church ("the Discipline")to get rid of the deacons and Board members opposing him. Yates then brought in another pastor, Wesley James, a minister at Franklin Street Missionary Baptist Church, to preside over the election. James asked the congregation if its members had been certified according to the Discipline. James testified at trial that no one objected to the procedure; however, on cross-examination, James admitted that the Discipline did not specifically address this type of procedure. He also admitted that the congregation was not allowed to ask questions to clarify the matter.[12] At the conclusion of the meeting, the congregation, by a vote of 130 to 100, ousted the Board members who opposed Yates and elected a new Board comprised of church members who were in favor of Yates.
Without appealing the matter under the provisions of the Discipline, which provides four levels of appeal for resolution of internal church disputes,[13] some of the ousted *349 Board members filed in the circuit court a motion seeking to have Yates held in contempt and also asking the court to set aside the election. More specifically, the ousted Board members challenged the sufficiency of notice, the qualifications of the moderator, the denial of their attempts to object to the motion, and the qualifications of the voters.
On July 19, 2001, the circuit court denied the request to hold Yates in contempt; however, it set aside the election, concluding that a church is bound to follow its own rules, and that this Church did not follow its rules.[14] The trial court dismissed any concerns related to the ecclesiastical appeals process, apparently reasoning that because Yates and the moderator did not follow the Discipline in conducting the election, the ousted Board members did not have to follow the Discipline. This appeal followed. The question before this Court is whether the principle of "separation of church and state" affects the jurisdiction of this Court. The history behind the doctrine of separation of church and state is important to a full understanding of the doctrine.

Historical Analysis
The phrase "wall of separation between church and state" is one of the most misunderstood and misconstrued concepts of modern history. When the United States Supreme Court decided Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), in February 1947, the Court expressed its opinion that the wall of separation between church and state "must be kept high and impregnable. We could not approve the slightest breach." Everson, supra, at 18, 67 S.Ct. 504. However, 1947 was not the first time the Supreme Court had occasion to consider the meaning of a "wall of separation between church and state." In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), the Court recognized the origin of that phrase to be Thomas Jefferson's letter to the Danbury Baptist Association (8 Jeff. Works 113). In that letter Jefferson stated:
"`Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith or his worship; that the legislative powers of the government reach actions only, and not opinions,I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion or prohibiting the free exercise thereof," thus building a wall of separation between church and State.'"[15]
Reynolds, 98 U.S. at 164 (emphasis added).
The Reynolds Court further recognized the distinction between church and state as expressed clearly in Jefferson's "Bill for Establishing Religious Freedom." Quoting Jefferson, the Court stated:
"[A]fter a recital `that to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles *350 on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty,' it is declared `that it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order.' In these two sentences is found the true distinction between what properly belongs to the church and what to the State."
Reynolds, 98 U.S. at 163 (emphasis added). The foundation upon which Jefferson could so boldly declare such a separation to exist is evident in the very beginning of his Bill for Establishing Religious Freedom, where he stated:
"Well aware that the opinions and belief of men depend not on their own will, but follow involuntarily the evidence proposed to their minds; that Almighty God hath created the mind free, and manifested his supreme will that free it shall remain by making it altogether insusceptible of restraint; that all attempts to influence it by temporal punishments, or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the holy author of our religion, who being lord both of body and mind, yet chose not to propagate it by coercions on either, as was his Almighty power to do ...."
Thomas Jefferson, Drafts of Legislation, "Bill for Establishing Religious Freedom" Thomas Jefferson: Writings 346 (Merrill D. Peterson, ed., 1984) (emphasis added). Thus, even Thomas Jefferson recognized that a separation between church and state existed because "Almighty God" was sovereign over both institutions. To prohibit that recognition would be to disregard both and respect neither. James Madison, as well as Jefferson, knew that an understanding of God was essential to an understanding of the separateness of the jurisdictions of church and state. The Court in Reynolds further opined that Madison also recognized that "`religion or the duty we owe the Creator,' was not within the cognizance of civil government." Reynolds, 98 U.S. at 163, quoting Madison's "Memorial and Remonstrance."
Contrary to popular opinion, the jurisdictional principle of the separation of church and state and its rationale, as emphasized in Reynolds, long predates the First Amendment to the United States Constitution. "Separationism, however, is not a recent innovation by twentieth century Secularists. Nor is it originally a Secularist position at all. Rather, Separationism has a long legacy as a theological view...." Ira C. Lupu & Robert Tuttle, The Distinctive Place of Religious Entities in Our Constitutional Order, 47 Vill. L.Rev. 37, 51 (2002).
Perhaps the antiquity of the concept of separation is most vividly illustrated by the Old Testament nation of Israel, where institutional lines were drawn so clearly that the chief of state, the king, could not even come from the same family or tribe as the chief ecclesiastical officer, the high priest. The king was from the tribe of Judah and the family of David; the high priest was from the tribe of Levi and the family of Aaron. Any king who violated the principle of the separation of church and state placed himself in grave danger. King Uzziah, son of Amaziah, was stricken with leprosy when he presumed upon the role of the priests in burning incense unto the Lord. II Chronicles 26:16-21 (King James). Azariah, the priest, said unto Uzziah, the king: "It appertaineth not unto thee, Uzziah, to burn incense unto the Lord, but to the priests, the sons of Aaron, that are consecrated to burn incense." II Chronicles 26:18 (King James) (emphasis on "not" added).
*351 Saul, the first king of Israel, trespassed upon the jurisdiction of the church by making a burnt offering instead of waiting for Samuel, the priest, to perform his duty. Samuel told Saul:
"Thou hast done foolishly: thou hast not kept the commandment of the Lord thy God, which he commanded thee: for now would the Lord have established thy kingdom upon Israel for ever.
"But now thy kingdom shall not continue: the Lord hath sought him a man after his own heart, and the Lord hath commanded him to be captain over his people, because thou hast not kept that which the Lord commanded thee."
I Samuel 13:13-14 (King James). Even the Babylonian King, Artaxerxes, in fear of the God of Israel,[16] recognized separate institutions when he commanded his treasurers to do whatever Ezra, the priest, requested for the reestablishment of the temple service in Jerusalem and to refrain from imposing any "toll, tribute, or custom" upon Levites, priests, or ministers of the house of God. Ezra 7:21-24.
While both the priest and the king were under the law of God, the role of civil government was separated from the worship of God. Years later, Jesus explicitly recognized that separation when he said, "Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's." Matthew 22:21 (King James).[17] While the payment of taxes belongs to Caesar, freedom of conscience and the right to worship God according to the dictates thereof, is a gift of God. Associate Justice Joseph Story of the United States Supreme Court in his Commentaries on the Constitution stated:
"The rights of conscience are, indeed, beyond the just reach of any human power. They are given by God, and cannot be encroached upon by human authority without a criminal disobedience of the precepts of natural as well as of revealed religion."
II Justice Joseph Story, Commentaries on the Constitution of the United States § 1876 (5th ed. 1891).
One author, noting the historical precedent for the separation principle commented: "The Christian church described in the New Testament was independent of, and sometimes at odds with, the political institutions of that time. Even after Christianity became the official religion of the Roman Empire, the `separate spheres' notion was widespread." Steven D. Smith, Separation and the "Secular": Reconstructing the Disestablishment Decision, 67 Tex. L.Rev. 955, 965 (April 1989) (footnote omitted).
Pope Gelasius I stated in 494 A.D.: "`Two [powers] there are ... by which this world is chiefly ruled, the sacred authority of the priesthood and the royal power ....'" Harold J. Berman, Law and Revolution: The Formation of the Western Legal Tradition 92 (Harvard University Press 1983). Gelasius reasoned that the "two powers"the civil government and the churchare supreme in their own spheres of cognizance, and each must refrain from attempting to invade the other's sphere. Russell Kirk, The Roots of American Order 436 (3d ed.1991). See also Berman, Law and Revolution at 92.
*352 Perhaps the institutional separation of church and state in Anglo-American law was most dramatically illustrated by the conflict between Henry II, King of England, and Thomas Becket, archbishop of Canterbury, in 1170. Berman, Law and Revolution at 256. When the previous archbishop of Canterbury died, Henry II was poised to nominate a successor. Seeing an opportunity to seize control of both the church and state, Henry nominated his close friend, Becket, then Lord Chancellor of England. Berman, Law and Revolution.
However, Becket was not as cooperative as Henry had expected, and a struggle between the two ensued. In 1164, Henry issued the Constitutions of Clarendon, setting out the royal position on the relationship of church and state. Henry's position, among other things, was that all disputes over the right of patronage of church offices were to be decided in the king's court; that the king's court had jurisdiction to determine rights to church property; that the king's court would exercise judicial review of ecclesiastical decisions; and that the church could not excommunicate any of the king's servants without the king's permission. Berman, Law and Revolution at 256-57. Especially instructive is Berman's assessment of the significance of the eighth article of the Constitutions of Clarendon:
"Historians of English law have analyzed the titanic conflict between Henry and Becket largely in terms of their respective positions in regard to article 3 [the double-jeopardy issue involved in trying a cleric in both the ecclesiastical court and the common-law court]. In fact, however, other provisions of the constitutions were more significant. Article 8 would have made the king, rather than the pope, the supreme arbiter of canon law in England."
Berman, Law and Revolution at 257. Becket refused to concede to Henry's demands, and ultimately Henry's officials murdered Becket in a cathedral. The public, who had grown fond of Becket, was outraged, and Henry was forced to observe penance. Berman, Law and Revolution at 256.
Within 50 years, the principles for which Becket stood, and ultimately died, were established. In the early 1200's, at Runnymede, King John approved the Magna Carta, the preeminent constitutional document in Anglo-American history. The first article of that document states:
"We have, in the first place, granted to God, and by this our present charter confirmed for us and our heirs forever that the English church shall be free and enjoy her rights in their integrity and her liberties untouched. And that we will this so to be observed appears from the fact that we of our own free will, before the outbreak of the dissensions between us and our barons, granted, confirmed, and procured to be confirmed by pope Innocent III the freedom of elections, which is considered most important and necessary to the English Church, which charter we will both keep ourself and will it to be kept with good faith by our heirs forever."
Basic Documents of English History 25 (Stephen B. Baxter, ed., Houghton Mifflin Company 1968)(emphasis added). Thus, the principle of the institutional separation of church and state became firmly established in the common-law jurisprudence of England and thereafter, as a result, in the jurisprudence of America.
Over time, the church began to seize more power in a world of constant political upheaval, and in many countries, the principle of separation of church and state was severely compromised as the power of the Papal See was enlarged by the use of *353 excommunication and papal "bulls." I Kenneth Scott Latourette, A History of Christianity (HarperCollins Publishers 1975). However, with the advent of the Reformation, attitudesboth political and religiouschanged. Martin Luther, who attributed many of the abuses in the Roman Catholic Church to its system of ecclesiastical law, developed an extremely limited view of the church's jurisdiction and a more expansive view of the state's jurisdiction. Harold J. Berman, Faith and Order: The Reconciliation of Law and Religion 161 (Scholars Press 1993).
Other noted individuals of the time clearly recognized the danger inherent in combining the two spheres. Upon finding the civil government in Geneva to be dominant over the local church, John Calvin,[18] the noted theologian and lawyer, worked tirelessly to establish the church as a distinct and separate institution. Noting his objection to the unification of church and state, Calvin stated his belief that church discipline should "be altogether distinct from the power of the sword [the power of civil government]." John Calvin, Institutes of the Christian Religion, Book IV, Chap. XI, § 5 (Henry Beveridge, trans., Wm. B. Eerdmans Publishing Company rep.1994).
During the seventeenth century the Puritans were partially successful in securing the independence of the church and securing its rights of self-government. Berman, Faith and Order at 110. Our Puritan ancestors who came to America were greatly responsible for establishing the separation of church and state in the United States. Nevertheless, in our early years of development, "[m]ost of the colonies had a single established church, along with groups of dissenters." Barry R. Schaller, A Legal Prescription for Bioethical Ills, 21 Quinnipiac L.Rev. 183, 323 (2002).
In 1659, Richard Baxter, the renowned British theologian, reenunciated and called for the proper separation between church and state:
"God doth not communicate all that Power in kind which is Eminently and Transcendently in himself to any one man, or sort of Officers; but distributeth to each their part; Civil Power to Civil Rulers, and Ecclesiastical to Church-Rulers."
Richard Baxter, A Holy Commonwealth 130, 131-32 (William Lamont, ed., Cambridge University Press 1994).
Against this backdrop, our First Congress under the Constitution sought to implement principles in the First Amendment to the United States Constitution that would preserve the integrity of the church from intrusion by the state. "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const., Amend. I. In part, the object of the First Amendment was to ensure that Congress would not establish a national church, which would be an explicit establishment of religion. In his discussion on the First Amendment, Justice Story commented:

*354 "The real object of the amendment was not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment which should give to a hierarchy the exclusive patronage of the national government."
II Story, Commentaries on the Constitution of the United States § 1877. By the early nineteenth century, all states with such an establishment had disestablished the churches in their states, and no established church remains in any state today.
In commenting on the design and purpose of "separation," as it applies to religious matters, James Madison asserted: "We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that religion is wholly exempt from its cognizance." However, Madison reached this conclusion only after first defining the term religion as "the duty which we owe to our Creator and the Manner of discharging it." James Madison, "Memorial and Remonstrance" (1785), II The Writings of James Madison 184-85 (Gaillard Hunt, ed., G.P. Putnam's Sons 1901). Madison explicitly recognized that maintaining a "separation" in no way meant to separate from civil government a belief in the sovereignty of God. Indeed, the very concept of separation mandates a recognition of a sovereign God. Madison explained:
"It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe...."
Madison, "Memorial and Remonstrance," II The Writings of James Madison at 184-85.
These historical examples are evidence that the recognition of the sovereignty of God is the very source of the principle of the separation of church and state. Although the concept of such a separation was nothing new, the success this concept had in America garnered attention from around the globe:
"Although [Alexis de Tocqueville] noted and approved of the separation of church and state, recognizing that religion `never intervenes directly in the government of American society,' he concluded that [religion] was `the first of their political institutions.' De Tocqueville saw religion not as intervening, but supporting the mores that make democracy possible."
Schaller, supra, at 324 (footnotes omittted).

Separation of Church and State is Jurisdictional
It is axiomatic that, to properly entertain a case, a court must have jurisdiction. Even our civil form of government is predicated upon a jurisdictional separation of powers between the executive, legislative, and judicial branches of civil government, and each branch is provided with its own realm of jurisdiction recognized by law. Likewise, the jurisdiction of civil government[19] does not encompass every dispute. See Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 *355 (1925) (Supreme Court affirmed injunction against the Oregon Compulsory Education Act, stating that "the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control").
Nevertheless, James Madison, the "Father of the Constitution,"[20] explained the difficulty in drawing the jurisdictional line between church and state: "`I must admit... that it may not be easy, in every possible case, to trace the line of separation, between the rights of the religious and civil authority, with such distinctness, as to avoid collisions and doubts on unessential points!'" Adrienne Koch, Madison's "Advice to My Country" 43 (Princeton University Press 1966). Confronting a jurisdictional issue in another case involving church and state, the United States Supreme Court noted: "There is, perhaps, no word in legal terminology so frequently used as the word jurisdiction, so capable of use in a general and vague sense, and which is used so often by men learned in the law without due regard to precision in its application." Watson v. Jones, 80 U.S. (13 Wall.) at 732.[21] But just because it is difficult to determine the boundary between church and state does not mean that we should ignore our responsibility to determine that boundary carefully in each particular case. On the contrary, it is with due regard for the difficulty and importance of the task that I examine the jurisdictions of religious and civil authority. Indeed, the great legal philosopher, John Locke, "esteem[ed] it above all things necessary to distinguish exactly the business of civil government from that of religion and settle the just bounds that lie between the one and the other." John Locke, "A Letter Concerning Toleration" (1689), 35 Great Books of the Western World 2 (Mortimer J. Adler, ed., University of Chicago 1971).
The churchas an institutiondoes not have authority over the affairs of civil government, and the stateas an institutiondoes not have authority over the affairs of church government because the state has concern for the things of this world while the church has concern for the soul of man in the next. Although civil government has the authority to enforce its laws with physical punishment and/or a monetary fine, a church cannot enforce criminal sanctions. Acknowledgment of this separation comes from a recognition that God is the source of all power.
In his letter concerning toleration, John Locke explained the practical significance of this separation:
"Every man has commission to admonish, exhort, convince another of error, and, by reasoning, to draw him into truth; but to give laws, receive obedience, and compel with the sword, belongs to none but the magistrate [civil government]. And, upon this ground, I affirm that the magistrate's power extends not to the establishing of any articles of faith, or forms of worship, by the force of his laws. ...
". . . .

*356 "... This only I say, that, whencesoever their authority be sprung, since it is ecclesiastical, it ought to be confined within the bounds of the Church, nor can it in any manner be extended to civil affairs, because the Church itself is a thing absolutely separate and distinct from the commonwealth. The boundaries on both sides are fixed and immovable."
John Locke, "A Letter Concerning Toleration," Great Books 3-7.
On the one hand, this separation protects the state's sphere of authority from intrusion by the church because religious institutions cannot enact civil laws or execute or interpret civil laws to bind the citizenry. On the other hand, this separation protects the church's sphere of authority from encroachment by the civil government because the state cannot dictate one's form of worship or one's articles of faith. In a letter to Edward Everett dated March 19, 1823, Madison explained:
"The settled opinion here is that religion is essentially distinct from Civil Gov[ernment] and exempt from its cognizance; that a connexion between them is injurious to both; that there are causes in the human breast, which ensure the perpetuity of religion without the aid of the law ...."
The Writings of James Madison, 126-27. "As it is unlawful for church-officers to meddle with the sword of the Magistrate, so is it unlawful for the Magistrate to meddle with the work proper to churchofficers." Cambridge Platform of the Massachusetts Bay Colony, Chap. XVII, § 5 (1648), recorded in the Plymouth Colony Records IX, 1663, Williston Walker, The Creeds and Platforms of Congregationalism 236 (Pilgrim Press 1960). "The Founders saw coercion in religious matters as an anathema to natural liberty and were deeply distrustful of `an alliance of civil and ecclesiastical power that would threaten religious liberty ....'" Eric W. Treene, Religion, the Public Square, and the Presidency, 24 Harv. J.L. & Pub. Pol'y 573, 585 (Spring 2001) (footnote omitted).
However it is only the "institutions" of church and state that must be separate and independent from one another. Individuals serving in civil government obviously can participate in the church, and people who participate in the church are not prohibited from participating in civil government. In fact, they may do so without leaving their religious beliefs at the door. Separation of church and state does not mean separation from our public life of the acknowledgment of God. Indeed the author of the phrase "wall of separation" between church and State," Thomas Jefferson, attended a church service on January 3, 1802, at the United States Capitol, two days after he coined that phrase. Church services were held in the Capitol building throughout the rest of his administration. James H. Hutson, Religion and the Founding of the American Republic 85-87 (Library of Congress 1998).
"As history has shown, separation of church and state grew from a need for public peace. Indeed, separation between political and ecclesiastical institutions... has been attributed as a cornerstone in Western modernity. It was then, perhaps, by no mistake that the framers of the Bill of Rights chose the first of their ten amendments to draw a line between the two. And they prayed when it was done."
John D. White, Constitutional LawEstablishment ClauseThe Seventh Circuit Upholds Constitutionality of School-Led Prayer at University Commencement Ceremony, 39 S. Tex. L.Rev. 165, 166 (Dec. 1997) (footnote omitted).
Another common misconception is the belief that the state is merely the lesspreferred *357 "power" for determining ecclesiastical and religious matters, or that the power of state may be wielded in the religious sphere whenever it is thought to be necessary or expedient. On the contrary, the state is simply without jurisdiction in such matters: "`It belongs not to the civil power to enter into or review the proceedings of a spiritual court.'" Watson, 80 U.S. (13 Wall.) at 730, quoting Harmon v. Dreher, 2 Speer's Equity 87 (S.C.1843) (emphasis added).
"[I]t is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,a matter over which the civil courts exercise no jurisdiction,a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,becomes the subject of its action.... But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon,[[22]] and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions."
Watson, 80 U.S.(13 Wall.) at 733-34 (emphasis added). The Supreme Court of Alabama has previously recognized its own lack of jurisdiction in religious disputes.
"Moral and theological problems are often of most difficult solution. The broadest philosophy is unconsciously warped by one's own creed. We say one's own, because by adopting it, we furnish the highest evidence that our conscience approves it. Yet, another, having equal advantages and equal intelligence, will condemn it as sincerely as we advocate it. Who is right, and who shall judge between us? This precise liberty of consciencethis right to differ with our fellow-menour constitution not only tolerates, but guarantees to every man. Hence it is, that questions of polemic theology can never obtain a standing in our courts of judicature. Hence it is, that the religious aspects of this case must be entirely ignored by us."
Desribes v. Wilmer, 69 Ala. 25, 27 (1881). As the Watson Court and this Court have warned, government intrusion into ecclesiastical *358 matters is not only unauthorized, but dangerous.
According to James Madison, the duties we owe to God and the manner of discharging those duties (i.e., our religion) are outside the province of the state and can be "directed only by reason and conviction, not by force or violence." Madison's "Memorial and Remonstrance"; "James Madison and Religious Liberty," I Annual Report of the American Historical Association 166 (1902). See also the Va. Const. of 1776, § 16. In his "Memorial and Remonstrance," Madison expounded on this idea:
"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable; because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men. It is unalienable also; because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society."
Writings at 184-85. Madison understood that the higher duty of rendering to God "those things which be God's" superseded and was outside the sphere of the state's authority, leading him to conclude that "in matters of Religion, no man's right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance." Madison, "Memorial and Remonstrance," Writings at 185.
The United States Supreme Court succinctly stated in Watson v. Jones, 80 U.S. (13 Wall.) at 730, quoting Harmon v. Dreher, supra: "The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of civil authority." That concept of respectful separation has historically been a hallmark of our laws, both federal and state.
Additionally, Ala. Const.1901, § 3, provides:
"That no religion shall be established by law; that no preference shall be given by law to any religious sect, society, denomination, or mode of worship; that no one shall be compelled by law to attend any place of worship; nor to pay any tithes, taxes, or other rate for building or repairing any place of worship, or for maintaining any minister or ministry; that no religious test shall be required as a qualification to any office or public trust under this state; and that the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious principles."
This Court has interpreted that clause as follows: "Religious quarrels or persecutions find no warrant, or even palliating excuse, in our constitutions and jurisprudence." Desribes, 69 Ala. at 26. The method with which a certain church or religious denomination chooses to resolve disputes, including the election of church officers, falls clearly within the parameters of church authority not subject to interference from the civil government. Centuries removed from the abuses that predicated our founding principles, some have forgotten these historical lessons. But the founders of our country were acutely aware that usurpations of authority, particularly in the areas of church and state, would ultimately lead to the deprivation of liberty.

*359 Legal Analysis

Did the lower court have jurisdiction to hear this dispute? "We must first determine whether the circuit court obtained jurisdiction to hear the contest." Nottage v. Jones, 388 So.2d 923, 925 (Ala.1980) (emphasis added). This is especially true in a case involving an ecclesiastical dispute. "As is the case with all churches, the courts will not assume jurisdiction, in fact has none, to resolve disputes regarding their spiritual or ecclesiastical affairs." Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746, 748 (Ala.1977).
It has long been held by the Alabama Supreme Court that in order for the court to have jurisdiction over a case involving an ecclesiastical dispute, at a minimum, a civil or property right must be in controversy. Williams v. Jones, 258 Ala. 59, 61 So.2d 101 (1952). Thus, the pertinent and preeminent inquiry, which the majority has overlooked, is whether a civil or property right is at issue in this case. The basis of the complaint in this case is that the Church did not comply with its own procedural rules for electing Church deacons and board members. By definition, procedural rules of a church do not fall under the venue of property-law or civilrights jurisprudence; therefore, the lower court simply did not have jurisdiction over this matter.
Consonant with this view is the United States Supreme Court's opinion in Watson v. Jones, in which that Court held that a denomination has a claim to the property of a local congregation only if the denominational constitution or local church charter contains language to that effect. Summing up its understanding of the distinction between the civil and ecclesiastical spheres, that Court stated:
"As regards its use in the matters we have been discussing it may very well be conceded that if the [church] should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up....
"But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,a matter over which the civil courts exercise no jurisdiction,a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,becomes the subject of its action."
80 U.S. (13 Wall.) at 732-33 (emphasis added).
Even though neither Watson nor this case is decided under the First Amendment to the United States Constitution, the federal courts, in First Amendment cases, have long recognized the principle involved here.
"The Supreme Court of the United States has steadfastly upheld the First Amendment's command that secular authorities may not interfere with the internal ecclesiastical workings and Discipline of religious bodies, although there may be occasions when civil courts can resolve disputes over the disposition and use of church property.
". . . .
"In short, ... hierarchical religious organizations [are permitted to] establish their own rules and regulations for *360 internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them."
Hutchison v. Thomas, 789 F.2d 392, 393-94 (6th Cir.1986) (minister filed an action against a church claiming he was improperly forced to retire). Other federal courts have expressed similar views. "This limited role is premised on First Amendment principles that preclude a court from deciding issues of religious doctrine and practice, or from interfering with internal church government." Dixon v. Edwards, 290 F.3d 699, 714 (4th Cir.2002). "Religious bodies must be free to decide for themselves, free from state interference, matters which pertain to church government, faith and doctrine." Dowd v. Society of St. Columbans, 861 F.2d 761, 764 (1st Cir.1988). "[I]t is well established that a civil court may not interfere in matters of church government, as well as matters of faith and doctrine." United Methodist Church, Baltimore Annual Conference v. White, 571 A.2d 790, 793 (D.C.1990).
Alabama cases support this respect for ecclesiastical jurisdiction. In Mount Olive Baptist Church v. Williams, 529 So.2d 972 (Ala.1988), a dispute arose between members of the Mount Olive Baptist Church. At issue were the votes of 35 individuals that were not counted in a church election. On appeal, this Court held that courts are not authorized to meddle in church elections because such elections, of course, involve ecclesiastical governance. 529 So.2d at 973.
In Hundley v. Collins, 131 Ala. 234, 32 So. 575 (1902), this Court was presented with a situation where the expulsion of a certain member was raised in a court. This Court held that, despite admitted procedural irregularities in the expulsion, church governance and internal membership relations are purely ecclesiastical matters and that the civil courts would not review such matters.
"Admitting, therefore, as we must on demurrer, that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegations of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of State and Church is so deeply intrenched in our constitutions and laws."
Hundley, 131 Ala. at 243, 32 So. at 578 (emphasis added). This Court further observed:
"`We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church. We must take the fact of expulsion as conclusive proof that the persons expelled are not *361 now members of the repudiating church; for whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this court.... When they [the complainants] became members, they did so on the condition of continuing or not, as themselves and their church might determine. In that respect, they voluntarily subjected themselves to the ecclesiastical power, and cannot invoke the supervision or control of that jurisdiction by this or any other civil tribunal.'"
131 Ala. at 244, 32 So. at 578-79 (quoting Shannon v. Frost, 42 Ky. (3 B. Mon.) 253 (1842)). See also Davis v. Ross, 255 Ala. 668, 671, 53 So.2d 544, 546 (1951)("the courts will not interfere with mere factional differences arising in ecclesiastical bodies"); United Baptist Church of Primitive Faith & Order at Poplar Springs v. Gautney, 250 Ala. 216, 34 So.2d 1 (1948).
The ousted deacons cite three cases to counter the argument that the circuit court lacked jurisdiction in this case. However, meaningful distinctions exist between those cases and this case. In Barton v. Fitzpatrick, 187 Ala. 273, 65 So. 390 (1914), the Alabama Supreme Court confronted two important issues: (1) ownership of property; and (2) church governance. The facts in Barton and this case are similar.
"Some of the members [of the church] ardently desired to be quit of the ministrations of the pastor, Fitzpatrick, and sought to oust him from his pastorate; others desired that he be retained. A majority of the board of deacons, some of whom had been placed upon the board by questionable means, adhered to Fitzpatrick, so that those members of the congregation opposed to him found it hard to get the question at issue before the body of the membership in a manner at once seemly and sanctioned by the practice of the church; Fitzpatrick and his faction refusing countenance to any movement looking to a meeting of the congregation for the disposal of the controversy. Finally, however, one of the opposing deacons arose in a meeting, held for worship, and gave notice that there would be a meeting of the congregation on a day named for the purpose of declaring the pastorate vacant and electing a successor to the then incumbent. This call for a meeting had not the approval of the pastor or a majority of the board of deacons, nor was the question whether such meeting should be called for the designated purpose put to the congregation then assembled for decision, and the clear effect of what Fitzpatrick in the pulpit did and said on that occasion was to indicate to the congregation that the notice amounted to nothing. A meeting was, however, held pursuant to the notice, with result that resolutions were there unanimously adopted purporting to oust Fitzpatrick and electing defendant Barton as his successor pro tempore. Deacons were also elected to replace those who adhered to Fitzpatrick. Since then Barton and his faction have held possession of the church property. At a later meeting they elected Barton pastor for an indefinite term. Fitzpatrick's faction ignored these meetings and took no part in them. The purpose of the bill, filed by Fitzpatrick and his deacons, was to have a legal determination of the right to the possession and control of the church property, and, it seems, complainants would have had the court to restore Fitzpatrick to his prerogatives as pastor. The court below very properly stopped with a decree settling the rights of the parties in the church property."
187 Ala. at 275-76, 65 So. at 391 (emphasis added). In other words, despite the *362 "questionable means" of church elections and governance, the court could properly exercise jurisdiction over only the question of the ownership of church property, and it specifically declined to interfere with issues related to the governance of the church.
"The pastor of a church in his pastoral office performs a spiritual function. Spiritualities are beyond the reach of the temporal courts. It follows that a church which has employed a pastor, though the employment be for a fixed term and at a fixed salary, may at any time, so far as the civil courts are concerned, depose him from his spiritual office, subject only to inquiry by the courts as to whether the church, or its appointed tribunal, has proceeded according to the law of the church ...."
187 Ala. at 280, 65 So. at 392-93. While the majority apparently reasons that it inquires only as to "whether the church, or its appointed tribunal, has proceeded according to the law of the church," it ignores the fact that in Barton, jurisdiction was conferred via a property right,[23] something that is not present herein.
Moreover, the majority opinion undermines the church's Discipline, which represents the ecclesiastical law of El Bethel Primitive Baptist Church, and which requires that decisions regarding the governance of the church proceed through the denominational appellate process. Here, unlike Barton, the parties seeking judicial intervention clearly disobeyed an explicit command of the church's Discipline that "[n]o church or Pastor is permitted to carry a case to the Civil Court of the land," and further disregarded the requirement to appeal local church governance decisions to and within the congregational hierarchy. Barton, unlike this case, does not mention any denominational appellate review; instead, Barton stated that "each [local] church is a law unto itself." 187 Ala. at 278, 65 So. at 392.
The Supreme Court of Alabama in Barton made it clear that it is the nature of the controversynot its procedural method of resolutionthat determines whether the civil courts have jurisdiction over such an issue. The act of the aggrieved Board members in proceeding in a civil court instead of following the church's procedure is itself a violation of the church's procedural rules. I fail to understand how a court can interfere in a church's election of deacons and rule against one faction on the basis that it violated the church's denominational rules while at the same time ruling in favor of the other faction, which, without question, violated a denominational rule and strict prohibition.
The majority and the ousted Board members rely heavily upon In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966). In that case, a congregation had split into opposing factions over the dismissal of the pastor and his access to, and control, or lack of control, of, the church property. At a purported congregational meeting held on September 19, 1964, those against the pastor voted to remove the pastor from his position and to disbar him from worship at the church. At a purported congregational meeting held on November 25, 1964, those who supported the pastor voted to void all of the motions passed at the September 19 meeting. Those supporting the pastor petitioned the trial court for an injunction prohibiting those who did not support him *363 from disrupting church services and from exercising further physical control over the church property. Those against the pastor petitioned for an injunction prohibiting those supporting the pastor from entering the church and alleging that the purported congregational meeting held on November 25 had not followed the church's Discipline and laws. The two petitions were combined; the trial court determined that both the September 19 meeting and the November 25 meeting were not proper congregational meetings and therefore that the results of both meetings were void. The trial court further ruled that the pastor was legally entitled to his office on the condition that he call a congregational meeting on March 28, 1965, in order to decide whether he should be retained or dismissed as pastor.
On appeal, this Court reversed the trial court's judgment insofar as it determined that the September 19 meeting was not a properly held congregational meeting, and held, therefore, that the pastor had been properly removed from his office. It affirmed the trial court's judgment insofar as it determined that the November 25 meeting was not a proper congregational meeting. While this Court entered into the issue whether those church meetings were conducted according to church rules, it was forced to do so in order to determine who had physical control of the church propertythe anti-pastor faction or the pro-pastor faction. The property dispute[24] gave the Court jurisdiction to decide the case, and the Court chose the least intrusive means of handling the dispute, because, as it observed: "Spiritualities are beyond the reach of temporal courts, and a pastor may be deposed by a majority of the members at a congregational meeting at any time, so far as the civil courts are concerned ...." 279 Ala. at 397, 186 So.2d at 106. Although the Galilee Court addressed some procedural irregularities in the church meetings, it reversed the trial court's intrusive order, specifically stating:
"[T]he [trial] court was without authority to grant to Thornes [the pastor] the right to occupy the pulpit of the church subject to the condition that he call a congregational meeting on the date specified in the decree. Such action would in effect amount to the court taking over and running the affairs of the Galilee Baptist Church. This is beyond the jurisdiction of the court."
279 Ala. at 397, 186 So.2d at 106. In contrast to Galilee, there is no property dispute in this case to give the Court jurisdiction to decide whether the congregational meeting was held in accordance with the church laws. Thus, Galilee, while containing some language that later courts (like the Abyssinia Court) might improperly expand upon, should not be relied upon by the majority as authority for taking jurisdiction in this case.
The ousted Board members also rely upon Abyssinia Missionary Baptist Church v. Nixon, supra, to support their *364 position that the courts have jurisdiction in this case. In Abyssinia, the plaintiffs, former members of the church, filed an action seeking a declaration that the congregational meeting at which they were expelled from membership failed to follow correct church procedure; an order requiring the church congregation to hold an election to determine whether the pastor should resign; and an order requiring the secretary to account for church moneys. The trial court dismissed the action for lack of jurisdiction. Contradicting Alabama precedent, this Court reversed the trial court's judgment, ruling that the civil courts may inquire "`as to whether the church, or its appointed tribunal has proceeded according to the law of the church,'" 340 So.2d at 748, quoting Galilee, 279 Ala. at 397, 186 So.2d at 106. The Court concluded that the plaintiffs were entitled to present evidence as to whether they had been properly expelled, i.e., expelled in accordance with church procedures.
The Abyssinia Court correctly observed that "[a]s is the case with all churches, the courts will not assume jurisdiction, in fact [have] none, to resolve disputes regarding their spiritual or ecclesiastical affairs. However, there is jurisdiction to resolve questions of civil or property rights." 340 So.2d at 748. However, it misapplied Galilee in determining that the courts had jurisdiction in Abyssinia. If the Court had stated that there was jurisdiction solely to order an accounting of church moneys, because that entails a property dispute, then it might have been correct. Instead, the Court bypassed ruling on the accounting issue and decided that the Court had jurisdiction to determine whether a meeting expelling the plaintiffs from membership in the church was held in accordance with the laws of the church. Yet there was no dispute over control of church property, as existed in Galilee, nor were the plaintiffs' civil rights in issue in the dispute. Thus, according to the Court's own statement, it had no jurisdiction to resolve the ecclesiastical dispute presented in Abyssinia.
In ruling that jurisdiction existed, the Abyssinia Court stated: "We recognize here there are civil, as opposed to ecclesiastical, rights which have cognizance in the courts. A determination of whether the fundamentals of due process have been observed can be made in the judicial arena." 340 So.2d at 748. This statement implies that church members possess a civil right to have congregational meetings follow church procedure. To the extent that Abyssinia stands for such a proposition, it ought to be overruled, because there exists no sound basis for such a holding. A church congregant does not have a civil right to have church elections follow the rules. If the church laws have not been followed, then the congregant has two optionsappeal to a higher church authority, if one exists, or leave the church. Unless the civil courts are to consider every dispute to be within their jurisdiction, they cannot take responsibility for policing the governance of the church; to do so would be to allow the civil government, on the basis of a feigned concern for some invented "civil rights" of the congregants, to nullify the actions of the church in quintessentially ecclesiastical affairs. The complaint of the ousted church members in Abyssinia was a complaint about fairness, not a claim asserting a civil rights violation. Complaints of unfairness involving church discipline are not cognizable by the courts because no congregant has a civil right to a fair church election.
This Court in Abyssinia exceeded the precedent of Galilee because no property or civil rights were at issue in Abyssinia. Likewise, the parties in this case have not alleged as a basis for their complaint any cause of action relative to the misappropriation *365 of money. Neither are they asserting that property rights are at stake. Instead, the ousted Board members complain about procedural irregularities in a church election affecting their leadership role and offices within the Church. The logical question is thus whether the office of church leadership is a civil or property right. Because it is neither, this Court does not have jurisdiction over this matter.
It is also interesting to note that the Court in Abyssinia cited Mount Olive Primitive Baptist Church v. Patrick, 252 Ala. 672, 42 So.2d 617 (1949). The Abyssinia Court then proceeded to contradict the very principle for which the Mount Olive opinion stands. In Mount Olive, two church members were ousted from membership and filed an action seeking to have themselves reinstated as members and officers of the church. The Court stated:
"[T]he civil courts will not interfere in case of a division in a religious society unless property rights are affected, nor even then if the basis of the schism is due merely to a disparate interpretation of doctrine. Such matters must be settled by the society itself."
252 Ala. at 674, 42 So.2d at 619. This Court explained the principle thoroughly:
"[I]t is established in this jurisdiction, and we think generally, that the courts will not intervene to settle a dispute regarding the right of membership.
"A case bearing much similarity is [Caples v. Nazareth Church, 245 Ala. 656, 18 So.2d 383 (Ala.1944) ], which, in reaffirming the long-established rule enunciated in Bouldin v. Alexander, 15 Wall. 131, 82 U.S. 131, 21 L.Ed. 69, quoted the following from that case: `... we [the courts] have no power to revise or question ordinary acts of church discipline, or of excision from membership. We have only to do with rights of property.'"
252 Ala. at 674, 42 So.2d at 619.
The language of the Mount Olive opinion, relying upon Hundley v. Collins, 131 Ala. 234, 32 So. 575 (1902), pointedly chastises both the Court that wrote the Abyssinia opinion and, in effect, the majority in this case:
"We think the court would be treading on most dangerous ground and invading a sanctuary not set apart for its jurisdiction if it should permit dissident minorities, believing themselves to have been improperly excluded because of the procedure by which they were exscinded, to invoke its power to determine such a factional dispute."
252 Ala. at 674, 42 So.2d at 619 (emphasis added).
Even if I agreed with the Abyssinia opinion, which I do not, the articles of church governance of El Bethel Primitive Baptist Church contain a clear prohibition upon the use of the civil courts in disputes of this nature, and the Church has a hierarchical appellate procedure through which complaints such as this one may be pursued. For the civil courts to enter into this dispute shows a disregard for that prohibition, and that disregard is exacerbated because the ousted Board members have not even followed the Primitive Baptist denominational appellate procedure. Thus, the trial court intruded upon the articles of faith and form of worship of this particular church, and that a court may not do. Unless a civil or property right is at issue, the courts have no jurisdiction over an ecclesiastical affair like the congregational meeting at issue in this case.
There is no justification for this Court to defer to the trial court on this matter. The filing of an action in the circuit court by the ousted Board members was undisputedly a clear violation of church rules. *366 The trial court certainly may not ignore a violation of the appeal procedures by the ousted Board members while at the same time taking particular note of a violation by Yates. Whether a trial court can intervene in this controversy is not only an important question, it is the threshold question.
Those who argue that this action does not entangle the courts with ecclesiastical matters are simply incorrect. Complete resolution of this case will eventually require the civil courts to rule on other matters of church doctrine. For example, if the parties cannot agree on who was eligible to vote as a member, the circuit court will necessarily have to decide that matter. The Church introduced evidence showing that a member in good standing is one whose tithing is up to date. How will the trial court resolve a disagreement over who is a true member? Will it require all voters to produce their tax returns along with proof that they are up-to-date on their tithes?
There is evidence in the record indicating that a person simply ceases to be a member when his tithe is not up-to-date. There was testimony that if this rule were invoked some of the Board members would not be qualified to vote and apparently would not be Board members. Are the plaintiffs in this case even members of the Church? Do they even have standing to bring this action? The usual implication is that a person bearing the title of deacon or trustee has some responsibility to maintain and account for church property and to oversee other governmental functions of the church. Is it also the responsibility of such church officers to keep a membership list up to date? There is a plethora of questions that could and should be asked, and many questions may not be easily answered by cursory reference to the Discipline.
As evidenced by the above questions, this action puts the civil courts squarely in the untenable position not only of resolving doctrinal matters but also of making rules and regulations for the church when and if they do not exist and further interpreting rules and regulations that may not be clear on their face.[25] Furthermore, the trial court's interposition lends itself to further inquiry into church rules with every new dispute between these parties. "Courts are virtually unanimous in concluding that disputes concerning the employment or status of pastors like Allen, or the interpretation and application of ecclesiastical rules of polity and procedure like that contained in the Book of Discipline, constitutionally cannot be the subject of civil court review." Allen v. Board of Incorporators, No. 92-C-6098 (N.D.Ill. December 18, 1992) (not published in F.Supp.).
The majority inquires as to whether the Church's decision was arbitrary and in violation of its own rules. However, it is well settled that such an inquiry is not reviewable by civil authority.
"For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense `arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive *367 criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them. ...
"`. . . .'
"Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of `fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance."
Serbian Eastern Orthodox Diocese, 426 U.S. at 713-15, 96 S.Ct. 2372 (footnote omitted). See also Dixon v. Edwards, 290 F.3d at 715 ("a civil court should defer to the final [church] authority within its hierarchy, declining even to determine whether an ecclesiastical decision is arbitrary, i.e., whether it has complied with church laws and regulations").
The majority opinion references testimony that tends to indicate that the attempts by certain of the deacons to appeal the election to the Primitive Baptist Church Association were thwarted. The election was held on June 17, and the ousted Board members filed their action in the circuit court to set aside the election and hold Yates in contempt on June 21. In other words, only four days after the purported election, the Board members filed an action in civil court. The Discipline says that if a party is not satisfied with the Association's handling of an appeal, that party can appeal to the Convention. The ousted Board members did not do that.
The majority refers to an allegation by the ousted Board members that the Association required that the pastor agree to an appeal. However, testimony clearly indicated that a majority of the Church could file an appeal with the Association. Still, those ousted from the Board did not resort to an appeal. However, neither this Court nor the trial court may substitute its judgment for that of a church's tribunal and pass judgment upon its ecclesiastical procedures.
Finally, the majority opinion states:
"[Yates's] reference to the appeal procedure is made simply for the purpose of chiding the Board for its alleged hypocritical inconsistency in contending that the June 17 election should be set aside for violating the Discipline, stating `[t]he Deacons/Trustees are not exactly slaves to the Primitive Church Discipline.'"
847 So.2d at 344. Perhaps Yates did not state his objection to the trial court's jurisdiction as eloquently as he could have, or perhaps his motives were improper. However, in a question of jurisdiction, specificity of objection or motives behind pleadings are not important. This Court may take cognizance of a question as to subjectmatter jurisdiction at any time and even on its own motion. Larkins v. Department of Mental Health & Mental Retardation, 806 So.2d 358, 364 (Ala.2001); see also Greco v. Thyssen Mining Constr., Inc., 500 So.2d 1143, 1146 (Ala.Civ.App. 1986) (wherein the Court of Civil Appeals held that this Court must review the issue of subject-matter jurisdiction, whether raised by a party or not). Indeed, it is our duty to consider the question of jurisdiction. "We must consider our jurisdiction regardless of whether any objection is raised by the parties." Wooden v. Board of Regents of University System of Georgia, 247 F.3d 1262, 1271 (11th Cir.2001).
*368 By recognizing a lack of jurisdiction, this Court would not be depriving any party of rights. The Discipline of the Church expressly provided that the Court would not become involved in its disputes, and the parties by their voluntary membership in the Church had agreed to those conditions. As the Watson Court explained:
"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organization itself provides for."
Watson, 80 U.S. (13 Wall.) at 728-29 (emphasis added).[26] The situation before us is exactly the kind described in the above passage, and this Court's precedent supports the view expressed therein. See Hundley v. Collins, 131 Ala. 234, 243-44, 32 So. 575, 578-79 (1902). To assert jurisdiction over this matter is error, and to ignore the self-governing system of the Church compounds that error and fosters the "subversion of such religious bodies."
This is not a criminal matter. It does not involve a breach of contract, a tort, or a property right. Nor does this case affect the rights of those outside the Church. Rather, this action relates solely to an internal church dispute. There is an appropriate forum and appeal structure to handle these claims, and the civil courts are not the appropriate forum.

Conclusion
The primary question in this case is one of jurisdiction. In Alabama, courts should not review ecclesiastical decisions unless, at a minimum, a property right or a civil right is implicated. This Court should overrule any cases that imply otherwise. No property right or civil right is called into issue in this case. The holding by the majority disregards the legitimate precedent of Alabama and established United States Supreme Court precedent and violates § 3, Ala. Const.1901.
In dissenting, I do not mean to comment upon which party to this controversy is legally "right." I write only to express my disagreement that a court of this State may enter into an ecclesiastical dispute regarding church government. This trespass is especially egregious when the dispute has yet to pass through that religious society's established appeals process, and the church Discipline expressly prohibits the ousted Board members from proceeding in civil court. A State court's involvement at this point is an interference in the *369 governance of that religious organization, and such involvement violates the jurisdictional principle of separation of church and state.
Jurisdictional separation of the institutions of church and state finds its origin in the history of the nation of Israel as found in the Old Testament. Throughout English and American history, a high regard for that separation has been manifest in numerous Supreme Court, federal court, and state court opinions. Those who today misunderstand the true meaning of the phrase "separation of church and state" wrongfully believe that it precludes the recognition of a sovereign God who is "lord both of body and mind" who "chose not to propagate it by coercions on either, as was his Almighty power to do." Thomas Jefferson, "Bill for Establishing Religious Freedom," Writings 346. To preclude the acknowledgment of Almighty God leads to two destructive errors: First, it denies the very source of the doctrine of separation of church and state; and second, it leads those who misunderstand that jurisdictional separation to wrongfully intrude the powers of the state into matters of faith and worship. To do so is error. Therefore, I dissent.
SEE, Justice (dissenting).
The only issue raised in this appeal is the validity of the June 17, 2001, election of a new Board of Deacons and Trustees at the El Bethel Primitive Baptist Church; therefore, that is the only issue properly before us. Although the ousted members of the Board alleged in their petition for a temporary restraining order or, in the alternative, for a preliminary injunction that the pastor, Jonathan Yates, has engaged in what may be tortious or criminal conduct, they sought only an order "[r]estraining Defendant, Rev. Jonathan Yates from interfering with the financial operation of the Church, interfering with all day to day operations of the Church, including supervising daycare employees and church employees, and ordering him to direct all church employees with financial records of the Church to turn over all financial records and documents of the Church to the Deacon and Trustee Boards." The trial court's order restrained the Reverend Yates only from 1) "obligating the church and its members in any financial manner without having the authority to do so by vote of the Church and the approval of the Board of Deacons and/or Trustees" and 2) "from authorizing loans of church monies to any person or entity."
On June 17, 2001, a new Board was elected. The plaintiffs returned to the trial court and moved for "contempt of this Court's order and [for] setting aside the results of the June 17, 2001 election of Deacons and Trustees of El Bethel Primitive Baptist Church ...." The trial court denied the motion for contempt, but granted the motion to set aside the June 17 election because "the church through its Pastor must follow its own rules. These rules should have been followed to the letter." Yates appealed, challenging only the order setting aside the church election.
This Court stated in Desribes v. Wilmer, 69 Ala. 25, 27 (1881): "[Q]uestions of polemic theology can never obtain a standing in our courts of judicature." The election of a deacon is necessarily steeped in church doctrine[27] and is a choice that, in turn, ultimately affects church doctrine.
*370 While it is tempting for the courts to step into the internal operations of a church to assure that the church functions as the courts believe it should,[28] to do so establishes a precedent that places at peril our cherished right to the free exercise of religious faith.[29] For this reason, I would not interfere in the deacon elections at El Bethel Primitive Baptist Church. I, therefore, dissent.
NOTES
[1] In its petition, the Board states: "The Deacon and Trustee Board are the Boards of the Church duly appointed and/or elected to oversee the management of the Church. The Boards meet jointly and all matters concerning the management of the Church are decided by the Boards at their combined monthly meetings. The Church membership has delegated to this combined Board the authority to transact all business on its behalf." Thus, the term "Board," as used in this opinion, refers to the combined board of deacons and trustees.
[2] Other than this reference, the record is silent as to a hearing held on June 12, 2001; however, it appears that the trial court was probably referring to the hearing held on June 28, 2001.
[3] Although the certificate of incorporation filed by the Church refers to the "Constitution and By Laws" of the Church, no constitution or bylaws of the Church appear in the record before us, and certain aspects of the record suggest that none were ever adopted.
[4] According to Kemp's testimony, a moderator is a person in the Association who has the authority to step in, if asked, and help churches resolve problems, such as the problem in this case. Kemp also testified that it would require some form of notice from the pastor of the church before either the Association or its executive board could step in to assist the church. Kemp also testified that, in the event the pastor did not invite the Association in, "Well I would go back again and say, now the pastor is in charge, regardless of the conflict the pastor is in charge. And if he say [sic] don't call a meeting, then they are going to have to do otherwise whateverwhatever robbery [sic] they have to take."
[5] The videotape is a part of the record for this appeal.
[6] With the exception of the remark discussed in the next paragraph.
[7] Although the record does not clearly identify what "certification" entails, we infer that James intended for certification to show that all those present were members in good standing of the Church.
[8] Edmund testified that in selecting new members for the Board the following procedure had been employed in the past: "He [Yates] would recommend a name orexcuse me. Or a list of names to the congregation, and they would go through a period of training, and then they would go before a Presbyterian consistent of elders of our denomination, and they would be asked the appropriate questions and all of that, and then the elders would retire and come back and give their finals to the congregation.... After which the congregation would vote." The record before us, including the videotapes of the June 3 and June 17 meetings, does not contain any evidence that this procedure was followed by the Board members recommended by Yates at the June 3 meeting and voted on at the June 17 meeting.
[9] According to the Discipline, a Presbytery "consists of three or more regularly ordained ministers of the gospel."
[10] The testimony of Edmund and Jackson indicates that elections of deacons and trustees were, at best, infrequent. Edmund testified that the last time he remembered a trustee's being elected was around 1985 or 1986, and that never before had the Church elected full Boards of trustees or deacons. Jackson stated that elections of new trustees or deacons had occurred approximately 6 to 7 times in the last 24 years, and she estimated that the last election for deacons was conducted within the last 3 to 4 years.
[11] The Board subsequently amended the petition to request, as alternative relief to the temporary restraining order, a preliminary injunction.
[12] Reverend James testified that the ousted Board members refused to ask questions if they would be videotaped doing so.
[13] At the end of the section of the Discipline explaining the appellate procedure, the following appears:

"NOTE: The decision of the National Primitive Baptist Convention shall be final.
"No church or Pastor is permitted to carry a case to the Civil Court of the land."
Chapter 9, paragraph 7, p. 57 of the Church Discipline of the National Primitive Baptist Convention (00056) (emphasis added).
[14] The trial court found that the notice to the Church members of the election, while technically deficient, was adequate in substance and was not the reason for its disallowing the election.
[15] As I explain fully below, I am not dissenting from the majority opinion in this case on the basis that that opinion is in conflict with the First Amendment to the United States Constitution but rather on the basis that the doctrine of the jurisdictional separation of the institutions of church and state prohibits the Court's involvement in this case.
[16] Artaxerxes explained the reason for this injunction: "Whatsoever is commanded by the God of heaven, let it be diligently done for the house of the God of heaven: for why should there be wrath against the realm of the king and his sons?" Ezra 7:23 (King James).
[17] See also Matthew 16:19 and 18:15-20, in which Jesus gives the church authority to resolve disputes and excommunicate members. In I Corinthians 6, Paul admonishes the church in Corinth against going to court against a brother.
[18] Calvin, aside from his historical status as a lawyer and theologian, had a vital connection to the birth of the United States:

"`If the average American citizen were asked, who was the founder of America, the true author of our great Republic, he might be puzzled to answer. We can imagine his amazement at hearing the answer given to this question by the famous German historian, Ranke, one of the profoundest scholars of modern times. Says Ranke, "John Calvin was the virtual founder of America."
John Eidsmoe, Christianity and the Constitution 18 (Baker Books 1987), quoting Lorraine Boettner, The Reformed Doctrine of Predestination 389 (Presbyterian and Reformed Publishing Company 1932).
[19] I use the term "civil government" and not "government" because in this case we are attempting to distinguish two forms of government. When referring to Alabama's civil government, I capitalize the word "State." In describing the institution of civil government in general, I use the term "state" and "civil government" interchangeably.
[20] Eidsmoe, supra note 18, Christianity and the Constitution 93.
[21] This Court has adopted the rationale of Watson, supra. Putman v. Vath, 340 So.2d 26 (Ala.1976). See, however, Trinity Presbyterian Church of Montgomery v. Tankersley, 374 So.2d 861 (1979) (this Court determined that a church is actually two entitiesa "secular legal corporation" and a "spiritual church" and distinguished Watson from the Trinity case because the dispute in the latter case dealt with real property owned by the "secular legal corporation" as opposed to ecclesiastical issues decided by the "spiritual church").
[22] Lord John Scott Eldon served as Chancellor of England from 1801 to 1827. Lord Eldon was widely regarded as the most learned English lawyer of his day. The "doctrine" to which the Court referred was the following erroneous holding by Lord Eldon:

"[I]t is the duty of the court in such cases to inquire and decide for itself, not only what was the nature and power of these church judicatories, but what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard."
Watson, 80 U.S. (13 Wall.) at 727 (discussing Lord Eldon's opinion in Attorney General v. Pearson, 3 Merivale 353). Though the Court admired Lord Eldon, evident from the more than 100 times the Court referred to this English judge's opinions in the nineteenth century, the Watson Court explicitly disagreed with Eldon on this issue because of the different law and history in the United States on matters involving the church and the state.
[23] In Barton, this Court stated:

"The legal right of the controversy depends upon the present location of the legal title ...."
187 Ala. at 278, 65 So. at 392.
[24] Although property rights are within a civil court's jurisdiction, even with respect to those matters the court must be careful to not exceed its jurisdiction.

"Even when rival church factions seek resolution of a church property dispute in the civil courts there is substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Because of this danger, `the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' Presbyterian Church v. Hull Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)."
Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).
[25] The trial judge, while stating that he was reluctant to enter into this ecclesiastical dispute, did not refrain from giving his opinion as to the appropriate ministerial functions of the Church. In response to testimony about the Church lending to members of the Church, the trial judge stated:

"Did I not also say that the scriptures I know, state you supposed to give to the poor, not lend to the poor. Isn't that what I said?"
[26] In 1952, the United States Supreme Court commented on the Watson case:

"The opinion radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as well as those of faith and doctrine."
Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952).
[27] I Timothy 3:8-15 (New International Version):

"8Deacons, likewise, are to be men worthy of respect, sincere, not indulging in much wine, and not pursuing dishonest gain. 9They must keep hold of the deep truths of the faith with a clear conscience. 10They must first be tested; and then if there is nothing against them, let them serve as deacons.
11 In the same way, their wives are to be women worthy of respect, not malicious talkers but temperate and trustworthy in everything.
12A deacon must be the husband of but one wife and must manage his children and his household well. 13Those who have served well gain an excellent standing and great assurance in their faith in Christ Jesus.
14 Although I hope to come to you soon, I am writing you these instructions so that, 15if I am delayed, you will know how people ought to conduct themselves in God's household, which is the church of the living God, the pillar and foundation of the truth."
The Discipline of the Primitive Baptist Church states:
"[A deacon] should be full of the Holy Ghost and wisdom (Acts 6:3). ... The duties of the deacon are as follows:
"1. To assist the pastor in maintaining unity among the flock.
"2. To see that the pastor's physical needs be supplied while he gives his full time to the gospel ministry.
"3. To report the welfare of the members to the pastor and deacon board.
"4. To serve tables, namely: a) Assist the pastor in serving the Lord's Table; b) To serve the table of the church; c) To serve the poor offering table.
"5. To assist the pastor in visiting the sick, widows and orphans and to keep himself unspotted from the world. (James chap. 1-27)."
[28] See In re Galilee Baptist Church, 279 Ala. 393, 397, 186 So.2d 102, 106 (1966), ("[T]he [trial] court was without authority to grant to [the pastor] the right to occupy the pulpit of the church subject to the condition that he call a congregational meeting on the date specified in the decree. Such action would in effect amount to the court taking over and running the affairs of the Galilee Baptist Church.").
[29] The United States Constitution, Amendment I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"); Constitution of Alabama 1901, Art. I, § 3 ("that the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious principles").

In Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871), the Supreme Court of the United States adjudicated a church-property dispute that arose during the Civil War when two factions of a Kentucky church body disagreed whether to withdraw from their national church organization or to obey that organization's order to support the Union and disavow slavery. The Court stated:
"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organization itself provides for."
80 U.S. (13 Wall.) at 728-29, 20 L.Ed. 666.